## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PHIL KERPEN, Individually and on Behalf
of All Others Similarly Situated,
  3322 Tennyson St., N.W.
  Washington, D.C. 20015,

CATHY RUSE, Individually and on Behalf
of All Others Similarly Situated,
  11573 Southington Lane
  Herndon, VA 20170,

AUSTIN RUSE, Individually and on Behalf
of All Others Similarly Situated,
  11573 Southington Lane
  Herndon, VA 20170,

CHARLOTTE SELLIER, Individually and on
Behalf of All Others Similarly Situated,
  11561 Southington Lane
  Herndon, VA 20170,

JOEL SELLIER, Individually and on Behalf
of All Others Similarly Situated,
  11561 Southington Lane
  Herndon, VA 20170, and

MICHAEL GINGRAS, Individually and on
Behalf of All Others Similarly Situated,
  37610 Cecilia Lane
  Purcellville, VA 20132,

                Plaintiffs,

    v.

METROPOLITAN WASHINGTON
AIRPORTS AUTHORITY,
  1 Aviation Circle
  Washington, DC 20001,

ANTHONY FOXX, in his official
capacity as SECRETARY OF
TRANSPORTATION,
  1200 New Jersey Avenue, SE
  Washington, DC 20590,

DEPARTMENT OF TRANSPORTATION,
  1200 New Jersey Avenue, SE
  Washington, DC 20590,

                Defendants.

**CLASS ACTION COMPLAINT**

## INTRODUCTION

1.      At the heart of this case is an unprecedented delegation of government power to the Defendant Metropolitan Washington Airports Authority ("MWAA") unfettered by any of the Constitution's structural protections against the unaccountable exercise of such power.

2.      MWAA manages the two federally owned Washington-area airports, Washington Dulles International Airport ("Dulles") and Ronald Reagan Washington National Airport ("Reagan" or "Washington National").  In addition, MWAA controls the 400-feet-wide, federally owned strip of real estate by which Dulles is connected to rest of the Washington, D.C. metropolitan area.  Within that strip of real estate, MWAA manages both the Dulles Access Highway ("Access Highway"), which provides the exclusive access for vehicles to Dulles, and the Dulles Toll Road ("Toll Road"), which was expressly built to handle local traffic *not* going to Dulles.  MWAA is also in charge of the Silver Line construction, another project within the Dulles Airport Access Highway and Right-of-Way that will connect the Washington, D.C. Metrorail system to Dulles Airport.

3.      Within that domain and beyond, MWAA has been delegated broad governmental powers—including the power to spend and tax, the police power, and the power of eminent domain—uncabined by any intelligible principles articulated by Congress.  Indeed, MWAA wields an almost unlimited power to determine the scope of its own activities.  MWAA can make billion-dollar decisions to approve any project or facility, including commercial enterprises "not inconsistent with the needs

PRIVILEGED AND CONFIDENTIAL

of aviation," so long as the Secretary of Transportation goes along.   49 U.S.C. § 40104(a)(2)(A)(iv).   MWAA thus has effectively unbridled discretion to make decisions with enormous economic consequences for the citizens who use the facilities it controls.   And to pay for the facilities it desires, MWAA can fashion any revenue-generating scheme it desires, going so far as to force one group of citizens to subsidize another group of citizens.

4.     MWAA's management of the Dulles Corridor Metrorail Project ("Dulles Metrorail Project")—one of the largest and most complex transportation projects in the United States which is building the Silver Line to serve Northern Virginia, Dulles, and beyond—is the most egregious example of MWAA's extra-constitutional regime.   MWAA has forced and continues to force users of the Toll Road— represented by the Plaintiffs here—to pay wildly inflated "tolls," amounting to some $2.8 billion dollars, to subsidize current and future users of the Dulles Metrorail Project.   MWAA is thereby exacting a massive subsidy (paying for over half of the costs of the Dulles Metrorail Project) from drivers who are obviously not using the Dulles Metrorail nor even going to Dulles.   Yet MWAA has not exacted one dime for the Dulles Metrorail Project from drivers on the Access Highway, which does at least go to Dulles, and does not propose to use fare revenues derived from users of the Dulles Metrorail Project, who will directly benefit from that facility, to fund its construction.

5.     MWAA is an unprecedented creature.   It exercises these extensive governmental powers but it is "independent of Virginia and its local governments,

PRIVILEGED AND CONFIDENTIAL

the District of Columbia, and the United States Government." 49 U.S.C. § 49106(a)(2). It was created at the command of Congress, under terms dictated by Congress, solely to manage and develop federal property, but it has the putative form of an interstate compact entity. In any event, however one categorizes MWAA, it is patently unconstitutional. MWAA itself only asserts as authority for its enormous governmental power the notion that it is a legitimate entity created by a legitimate interstate compact authorized by Congress. But the agreement pursuant to which MWAA operates cannot possibly be a valid compact under the U.S. Constitution's Compact Clause (Article I, § 10, cl. 3) because one of the two signatories—the District of Columbia—is not a State within the meaning of that Clause and, furthermore, because MWAA exercises *federal* authority wholly inappropriate for a legitimate interstate compact entity.

6. But irrespective of whether MWAA is a legitimate Compact Clause entity, the extraordinary delegation of federal power of which MWAA is the beneficiary violates the constitutional separation of powers. It is an unconstitutional delegation of federal legislative power in violation of Article I or, alternatively, an unconstitutional delegation of federal executive power in violation of Article II. In addition, it is a violation of the Toll Road users' rights under the federal Administrative Procedure Act and the Due Process Clause of the Fifth and Fourteenth Amendments.

7. This lawsuit seeks to remedy these and other violations of federal law through declaratory and injunctive relief that will put a halt to MWAA's unlawful

PRIVILEGED AND CONFIDENTIAL

action, and through monetary relief that will offer restitution to the hundreds of thousands of Toll Road users who have already been victimized by MWAA's exercise of unaccountable government authority, delegated in disregard of the Constitution's structural norms.

8.     At the same time, however, this lawsuit does not take a position on the value of the Dulles Metrorail Project's Silver Line to the communities it serves.  Nor does this lawsuit ask the Court to determine whether the project has enough value to justify its massive costs.  Rather, what animates this lawsuit is Justice Holmes' famous admonition:  "We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change."  *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 416 (1922).

## JURISDICTION AND VENUE

9.     The Court has jurisdiction under 28 U.S.C. § 1331 to enter injunctive relief, to order restitution, and to secure any other appropriate equitable relief because the action arises under the United States Constitution and federal law.

10.     The Court may enter declaratory relief under 28 U.S.C. § 2201.

11.     The Court has jurisdiction under 28 U.S.C. § 1343(a) to enter injunctive relief, to order restitution, and to secure any other equitable relief to which Plaintiffs are entitled to redress the deprivation of their constitutional and federal rights secured by 42 U.S.C. § 1983.

PRIVILEGED AND CONFIDENTIAL

12.     The Court has jurisdiction under 49 U.S.C. § 49104(c) to compel MWAA to comply with the terms of the lease between MWAA and the Secretary of Transportation concerning the Metropolitan Washington Airports.

13.     Venue is proper under 28 U.S.C. § 1391(b) and (c) because MWAA is located in this judicial district; a substantial part of the events or omissions giving rise to this action occurred in this judicial district; and MWAA, an entity subject to sue and be sued in its common name under applicable law, is subject to this Court's personal jurisdiction with respect to the civil action in question.

14.     Venue is also proper under 28 U.S.C. § 1391(e) because this is an action against officers and agencies of the United States; the Department of Transportation resides in this judicial district; the Secretary of Transportation performs his official duties in this judicial district; and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## **PARTIES**

15.     Plaintiff Phil Kerpen is a resident of Washington, D.C.  For about the past 16 years, he has periodically used, and continues to use, the Dulles Toll Road for a variety of purposes.  He pays tolls in cash.

16.     Plaintiff Cathy Ruse is a resident of Herndon, Virginia.  For the past several years, she has regularly used, and continues to regularly use, the Dulles Toll Road for a variety of purposes.  She pays tolls via transponder.

**PRIVILEGED AND CONFIDENTIAL**

17.    Plaintiff Austin Ruse is a resident of Herndon, Virginia.  For the past several years, he has regularly used, and continues to regularly use, the Dulles Toll Road for a variety of purposes.  He pays tolls via transponder.

18.    Plaintiff Charlotte Sellier is a resident of Herndon, Virginia.  For the past several years, she has regularly used, and continues to regularly use, the Dulles Toll Road for a variety of purposes.  She pays tolls via transponder.

19.    Plaintiff Joel Sellier is a resident of Herndon, Virginia.  For the past several years, he has regularly used, and continues to regularly use, the Dulles Toll Road for a variety of purposes.  He pays tolls via transponder.

20.    Plaintiff Michael Gingras is a resident of Purcelville, Virginia.  For the past several years, he has regularly used, and continues to regularly use, the Dulles Toll Road for a variety of purposes.  He pays tolls via transponder.

21.    Defendant Metropolitan Washington Airports Authority ("MWAA") is a public body created and given authority by legislative action of Virginia, the District of Columbia, and Congress.  *See* D.C. Code §§ 9-901 *et seq.*; Va. Code §§5.1-152 *et seq.*; 49 U.S.C. § 49104 *et seq.*  MWAA is "independent of Virginia and its local governments, the District of Columbia, and the United States Government." 49 U.S.C. § 49106(a)(2).  It is "a political subdivision constituted only to operate and improve the Metropolitan Washington Airports as primary airports serving the Metropolitan Washington area." *Id.* § 49106(a)(3).  MWAA is located at 1 Aviation Circle, Washington, DC 20001.

PRIVILEGED AND CONFIDENTIAL

22.     Defendant Anthony Foxx ("Secretary") is sued in his official capacity as Secretary of the U.S. Department of Transportation ("Department").  The Secretary is the federal official ultimately responsible for the Department's actions and operations.   Among other duties, the Secretary is required by federal law to determine whether real property leased to MWAA is used for "airport purposes," and is authorized to order MWAA to use leased property for such purposes or to retake possession of that property in the event of MWAA's failure to do so. 49 U.S.C. § 49104(a)(2)(C).

23.     Defendant Department is an executive agency of the United States Government located at 1200 New Jersey Avenue, SE, Washington, DC 20590.

<u>**COMMON SUBSTANTIVE ALLEGATIONS**</u>

**I.     Congress authorizes construction of Washington National and Dulles Airports, the Dulles Access Road, and the Dulles Toll Road.**

24.     Reagan and Dulles are two major airports serving the D.C. metropolitan area. Congress authorized the construction of Reagan (at the time called "Washington National") in 1940, *see* 54 Stat. 686, and the airport opened in 1941.  Congress authorized the construction of Dulles in 1950, *see* 64 Stat. 770, and the airport opened in 1962.  Both airports are owned by the federal government, and until 1986 both were under the direct control of the Federal Aviation Administration.

25.     In addition to federal ownership of the airports themselves, the federal government owns the Airport Access Highway and Right-of-Way, a strip of land on which an approximately 14-mile, four-lane highway links Dulles with the Capital

PRIVILEGED AND CONFIDENTIAL

Beltway and Interstate Route I-66, and on which most of the Dulles Metrorail Project is located.  The same federal statute that authorized construction of Dulles also authorized construction of the Access Highway.  *See* 64 Stat. at 771 (authorizing Secretary of Commerce to "construct any streets, highways, or roadways . . . as may be necessary to provide access to the airport").  By law, motorists may use the Access Highway only for traveling to and from the airport.

26.    In 1983, the federal government granted an easement to the Commonwealth of Virginia over a portion of the federally-owned corridor containing the Access Highway.  On this easement, the Virginia Department of Transportation ("VDOT") built the Toll Road, an approximately 14-mile toll highway that runs along both sides of the Access Highway and then past Dulles into Loudoun County, Virginia.  The purpose of the Toll Road was to accommodate increasing non-airport traffic in the area, without compromising the Access Highway's dedicated role as the sole artery for airport traffic to and from Dulles.  VDOT began operating the Toll Road in 1984.  Construction of the Toll Road was financed through the issuance of state bonds, which have been paid off in full by the tolls paid by Toll Road users.

## II.    MWAA is created and empowered by the District, Virginia, and Congress.

27.    MWAA was created as a way to circumvent the normal congressional appropriations process which, because of the federal budget deficit, could not fund improvements at Reagan and Dulles desired by members of Congress.  The problem was solved in 1984, when an advisory commission convened by then-Transportation Secretary Elizabeth Dole recommended that operation of Washington National and

PRIVILEGED AND CONFIDENTIAL

Dulles airports be transferred to an "independent authority to be created by Virginia and the District of Columbia" 49 U.S.C. § 49101(11), which could raise the needed money by selling tax-exempt bonds.  *See Metropolitan Washington Airports Auth'y v. Citizens for the Abatement of Aircraft Noise, Inc.,* 501 U.S. 252, 257 & n.3 (1991) ("*CAAN*").

28.     In response to the commission recommendation, Virginia, D.C., and Congress each enacted legislation creating and empowering MWAA as an "independent public authority" dedicated to operating Washington National and Dulles.  *See* 1985 Va. Acts. ch. 598; 1985 D.C. Law 6-67; Metropolitan Washington Airports Act of 1986, 100 Stat. 3341.

29.     More specifically, Virginia and D.C. enacted virtually identical legislation in 1985 creating MWAA as a "public body corporate and politic" which is "independent of the Commonwealth [of Virginia] and its local political subdivisions, the District of Columbia, and the federal government," and setting forth MWAA's structure and authority.  *See generally* VA. CODE §§5.1-152—5.1-163; D.C. CODE §§ 9-901—9-926.

30.     Soon thereafter, Congress enacted the Metropolitan Washington Airports Act of 1986 ("Airports Act"), 100 Stat. 3341.  *See generally* 49 U.S.C. §§ 49101-49112.  Among other things, the current version of the Airports Act:

a.   provides that MWAA's powers, while ostensibly conferred by D.C. and Virginia, shall "at least" meet Congress's "specifications" in the Airports Act (*id.* § 49106(a)(1));

b.   requires that MWAA be "independent of Virginia and its local governments, the District of Columbia, and the United States Government" (*id.* § 49106(a)(2));

PRIVILEGED AND CONFIDENTIAL

c.  specifies that MWAA is "constituted only to operate and improve the Metropolitan Washington Airports" (*id.* § 49106(a)(3));

d.  sets forth which functions MWAA "shall be authorized" to perform, such as issuing bonds, acquiring property, and "levy[ing] fees or other charges" (*id.* § 49106(b)(1)(A)-(F));

e.  defines the structure and operation of MWAA's Board of Directors (*id.* § 49106(c));

f.  requires that MWAA have a 17-member Board appointed as follows: 7 members by the Virginia Governor, 4 by the D.C. Mayor, 3 by the Maryland Governor, and 3 by "the President with the advice and consent of the Senate" (*id.* § 49106(c)(1)(A)-(D));

g.  provides that Board members may be removed only for cause by the official who appointed them (*id.* § 49106(c)(6)(C));

h.  requires MWAA to take certain actions by regulation (*id.* § 49106(e));

i.  requires MWAA to provide the federal Secretary of Transportation with two paid "staff individuals" and "clerical and support staff" to "assist" the Secretary in carrying out the Airports Act (*id.* § 49106(f));

j.  provides that the federal Comptroller General "shall review" MWAA contracting procedures and submit "periodic reports" of his conclusions to House and Senate committees (*id.* § 49106(g));

k.  defines the terms of MWAA's lease of federal land to operate the airports (*id.* § 49104);

l.  restricts MWAA's use of airport property to "airport purposes," but defines those purposes to include any "business or activity not inconsistent the needs of aviation" (*id.* § 49104(a)(2)(A)(iv)),

m.  authorizes MWAA to exercise the power of eminent domain (*id.* § 49106(b)(1)(D); Va, Code § 5.1-160(C));

n.  authorizes MWAA to exercise police powers through a "regular police force" (49 U.S.C. § 49111(c); Va, Code § 5.1-158(B)); and

o.  empowers the Secretary, as a term of the MWAA lease, to determine whether MWAA's use of the leased property constitutes an approved "airport purpose" (*id.* § 49104(a)(2)(A)(iv) & (C)).

31.    In 1987, the Secretary and MWAA entered into a 50-year lease of the Washington National and Dulles airport properties.   In 2003, the lease was extended by an additional 30 years to 2067.

## II.   Taking passengers to Dulles is only one, and not the most important, purpose of the Dulles Metrorail Project.

32.    While the Dulles Metrorail Project's Silver Line will ultimately go to

Dulles Airport, that is only one of 11 stops on the Silver Line, as illustrated by the

following map:



Silver Line Stations, *available at* http://www.dullesmetro.com/silver-line-stations/.

33.    Thus the Silver Line does not end at Dulles, but in Loudoun County,

and on the way has multiple stops in some of the most highly populated

communities in Northern Virginia.  But the Silver Line's service area is actually

even broader, as the Silver Line itself explains: "Traveling east, Silver Line trains

joins [sic] the existing Orange Line just west of East Falls Church, and then travels

PRIVILEGED AND CONFIDENTIAL

all the way through downtown D.C. to Largo Town Center, serving all stations along the way just like the Orange and Blue Lines."   About the Silver Line, *available at* http://silverlinemetro.com.

34.   Consistent with these service responsibilities that include far more than just Dulles, the central purpose of the Silver Line has long been to provide transportation to commuters and other people moving about the communities of Northern Virginia, and in so doing to foster economic development throughout the region.  As the Washington Metropolitan Area Transit Authority ("WMATA") put it at the opening of the Silver Line:

> The Dulles Corridor is home to several of the Washington, D.C. metropolitan region's most dynamic and rapidly growing activity centers, including Tysons Corner (Virginia's largest employment center), and the Reston-Herndon area (Virginia's second largest employment center), Dulles International Airport and the emerging activity centers in eastern Loudoun County.  Silver Line trains will provide high-quality, high-capacity transit service that reduces travel time between the Dulles corridor and Downtown D.C., expands the reach of the existing rail system, offers a viable alternative to automobile travel and supports future development.

Press Release, WMATA, Metro launches Silver Line, largest expansion of region's rail system in more than two decades (July 25, 2014), *available at* http://www.wmata.com/about_metro/news/PressReleaseDetail.cfm?ReleaseID=5749.

35.   Defendant Secretary of Transportation Foxx said at the time: "The Obama Administration is proud to be a partner in delivering more world class transportation options to the Washington Metropolitan Area and connecting

PRIVILEGED AND CONFIDENTIAL

thousands of residents and visitors with major employment, education and economic opportunities throughout the region." *Id.*

36.    WMATA expanded on the broad service the Silver Line is expected to provide:

> It is anticipated that the Silver Line will quickly become one of Metro's busiest services because of the draw of two employment and entertainment destinations – Downtown DC and Tysons – appealing to riders at all times of the day and week. Serving many of the region's great destinations, the Silver Line will deliver football fans to FedEx Field and baseball fans to Nationals Park, entertainment destinations in Arlington County, and nationally known cultural attractions in Downtown DC.

*Id.*

37.    Similarly, Rep. Gerald Connolly observed at the time:

> The Silver Line will have a transformative effect not only for Northern Virginia but also for the National Capital Region. For the first time we will connect the downtown core with the regions second largest economic hub, making new jobs, housing, and cultural destinations more accessible, whether you live in Springfield, suburban Maryland or D.C. The Silver Line will provide immeasurable benefits for generations to come by taking cars off our roads and further propelling the regional economy.

*Id.*

38.    Few even mentioned the service the Silver Line would provide to Dulles, which only brought up the rear in a list of the project's more important benefits. For example, Representative Frank Wolf said: "The Silver Line is going to be good for transportation. The Silver Line is going to be good for economic development. The Silver Line is going to be good for Dulles airport." *Id.* Likewise Senator Tim Kaine noted: "The Silver Line will boost the regional economy, improve

PRIVILEGED AND CONFIDENTIAL

daily life for thousands of commuters and ultimately enable Dulles to reach its full potential as an international airport." *Id.* Indeed, the importance of completing the Silver Line has not been described in terms of linking up with Dulles, but in terms of the broader economic impact for the region. As Jack Potter, the President and CEO of MWAA put it: "Its completion will improve the transportation options for those traveling through the region and serve as a major driver for the local economy." Dulles Metrorail Silver Line, Phase 2: Linking Washington's Metro to Dulles Airport & Beyond, *available at* https://www.clarkconstruction.com/our-work/projects/dulles-metrorail-silver-line-phase-2.

39.     The core benefits of the Silver Line that have nothing to do with getting to Dulles have not been lost on businesses in the area. *See, e.g.,* Hilton McLean Tysons Corner, *available at* http://www3.hilton.com/en/hotels/virginia/hilton-mclean-tysons-corner-MCLMHHH/about/metro-info.html (noting that this hotel is close to a Silver Line station, and that the "Silver Line offers a great value, hassle-free method of reaching Washington DC and the surrounding areas"); www.LiveNearMetro.com, *available at* http://livenearmetro.com/RealtorWebPage?custompage_id=1547822841 (realtor listing properties for sale or rent near the Silver Line).

40.     Thus, while serving Dulles is one reason for the construction of the Dulles Metrorail Project's Silver Line, its central rationale is to achieve broader economic benefits for the region—effects far beyond its impact on the airport or aviation needs.

PRIVILEGED AND CONFIDENTIAL

## IV.   MWAA takes over operation of the Toll Road to finance the Dulles Metrorail Project.

41.   In 2006, MWAA proposed to VDOT that MWAA take over operation of the Toll Road and "harness the revenue stream from the Toll Road" in order to finance construction of the Dulles Metrorail Project.

42.   In MWAA's 2006 proposal to VDOT to operate the Dulles Toll Road and construct the Dulles Metrorail Project, it pledged that all revenues from Toll Road operations would stay in the Dulles Transportation Corridor, that its use of those revenues and the property interests it controlled would be limited to airport purposes, and that toll rates would remain flat through 2060 on an inflation-adjusted basis until capacity constraints are reached or improvements are needed.

43.   That same year, MWAA and VDOT entered into a Memorandum of Understanding, which recited that authority to operate the Toll Road would be transferred to MWAA.  That transfer, however, was specifically "in consideration of [MWAA] . . . using toll revenues as a non-federal source of funding to construct the Dulles Corridor Metrorail Project …."  Subsidization of the Dulles Metrorail Project by Toll Road users was thus a central feature of this agreement.

44.   Later in 2006, the parties entered into additional agreements— including the Dulles Toll Road Permit and Operating Agreement ("Toll Road Agreement" or "Agreement")—under which MWAA obtained the exclusive authority to operate the Toll Road and set, charge and collect tolls in consideration for MWAA's obligation to fund and construct the Dulles Metrorail Project.  Once again, cross-subsidization of that project from Toll Road users was central.  Under these

**PRIVILEGED AND CONFIDENTIAL**

agreements, VDOT has no right to direct or control MWAA's activities and decisions.

45.     In particular, the Toll Road Agreement:

a. recognizes MWAA's authority under the Agreement to "establish, charge and collect tolls" from Toll Road users (Agreement, § 4.01(a));

b. provides that all toll revenues "shall be the property of [MWAA] to be retained, assigned and otherwise used by [MWAA] without further approval" of any other person, except as provided in the Agreement (*id.* § 4.01(c));

c. gives MWAA sole responsibility for financing all Toll Road operations and the Dulles Metrorail Project through the issuance of "Toll Revenue Bonds" and other instruments (*id.* §§ 5.01-5.02).

46.     Financial projections incorporated into the Toll Road Agreement show that MWAA planned to finance the Metrorail Project in large part by relying on tens of millions of dollars in annual projected surpluses of toll revenues. *Id.*, Ex. D. Out of a projected budget of $5 billion through the year 2057, available toll revenues were projected to account for over $3 billion of funds available to finance the Dulles Metrorail Project. *Id.*

47.     A June 2007 resolution adopted by MWAA confirmed, among other things, that the Toll Road Agreement would afford MWAA "control over the Dulles Toll Road for fifty years, making its revenues available to pay a substantial portion of the costs of constructing the Metrorail extension." MWAA Resolution No. 07-16, Financial Administration of the Dulles Toll Road and Dulles Corridor Metrorail Project (June 6, 2007). The resolution further provided that "[t]he principal source of Toll Road revenues … will be from tolls, to be set by [MWAA] regulation at a level to generate funds sufficient … to support any debt service requirements necessary

to construct the Dulles Corridor Metrorail Project." *Id.* The resolution also provided that MWAA would "from time to time, issue in its own name … Dulles Toll Road revenue bonds, notes and other financing instruments … payable solely from revenues derived from tolls, fees and other charges on the Dulles Toll Road, from refunding bonds or as otherwise specified in a financing instrument." *Id.* Once again, subsidization of the Dulles Metrorail Project by Toll Road users was central to MWAA's scheme.

48.     In October 2008, the federal Secretary of Transportation certified that MWAA's operation of the Toll Road and its use of toll revenue to fund construction of the Dulles Metrorail Project were valid "airport purposes" within the meaning of MWAA lease with the federal government.

49.     In November 2008, based in part on this certification by the Secretary, operating and financial control of the Toll Road was transferred to MWAA.

**V.     The Dulles Metrorail Project is financed through billions in projected toll revenues.**

**A.     MWAA pledges toll revenues to finance the Dulles Metrorail.**

50.     In August 2009, MWAA issued four series of Dulles Toll Road Revenue Bonds amounting to a debt of approximately $963 million. The principal purpose of the bonds was to "fund Dulles Toll Road and Corridor Capitol Improvements" and to "pay a portion of the costs of the Dulles Metrorail Project." The bonds were "[p]ayable from[,] and secured by a pledge of, the Toll Road Revenues collected by MWAA from the Dulles Toll Road." *See* MWAA Debt Service Review, at 37-41 (Dec. 31, 2015).  From 2010 through 2014, MWAA subsequently issued an additional four

**PRIVILEGED AND CONFIDENTIAL**

series of Dulles Toll Road Revenue Bonds, which amount to an additional debt of approximately $764 million, while also receiving a federal loan of $1.278 billion. *See id.*, at 37, 42-46.  The total amount of debt issued through the revenue bonds and the federal loan is approximately $3 billion. *Id.* at 37.

51.    At that time, MWAA held public hearings to explain the need for toll rate increases to support financing of the Dulles Metrorail Project.  In its public hearing materials, MWAA announced that: "A key component of the financing plan for the Metrorail Project is the issuance of approximately $2.9 billion of Dulles Toll Road revenue bonds over the next five years. To generate sufficient gross toll revenue to support the anticipated amount of toll revenue debt, the Airports Authority will need to increase toll rates."  In other words, Toll Road users would be required to subsidize construction of the Dulles Metrorail Project.

52.    MWAA estimated that 52.6% of the overall funding for the Dulles Metrorail Project would come from tolls—totaling some $2.76 billion.  More specifically, tolls would fund approximately 43.6% of "phase one" of the project, and 62.5% of "phase two," as illustrated by the following MWAA chart:

PRIVILEGED AND CONFIDENTIAL

## Dulles Corridor Metrorail Project
### Funding Allocation with $2.5 billion Phase 2 planning estimate

| SOURCES OF CAPITAL FUNDS (Thousands YOE Dollars) | PHASE 1 Total | PHASE 2 Total | TOTAL PROJECT Total | % of Total |
|---|---|---|---|---|
| Federal | $ 900,000 | $ - | $ 900,000 | 17.1% |
| Commonwealth of Virginia | 251,700 | 23,300 | $ 275,000 | 5.2% |
| Fairfax County | 400,000 | 446,167 | 846,167 | 16.1% |
| Loudoun County | - | 252,273 | 252,273 | 4.8% |
| MWAA (Aviation Funds) | - | 215,484 | 215,484 | 4.1% |
| MWAA (Dulles Toll Road) | $ 1,203,995 | $ 1,562,776 | $ 2,766,771 | 52.6% |
| TOTAL SOURCES OF FUNDS | $ 2,755,695 | $ 2,500,000 | $ 5,255,695 | 100.0% |

= Contribution is fixed amount
= Contribution is fixed percentage of total cost
= Contribution is not fixed - amount and percentage of total cost can change.

*See* Dulles Corridor Advisory Committee, *Dulles Corridor Enterprise Financial Update* 3 (Nov. 18, 2012), *available at:* http://www.metwashairports.com/sites/default/files/archive/mwaa.com/file/4-Financial_Update.pdf.  As the chart shows, MWAA contemplated that Toll Road users would subsidize construction of the Dulles Metrorail Project to the tune of more than $2.75 billion dollars.

**B.    MWAA nearly triples Toll Road tolls over a four-year period.**

53.    Consistent with the scheme that Toll Road users would subsidize the Dulles Metrorail Project, in November 2009, MWAA adopted a resolution approving a series of stair-step toll rate increases that would take effect in 2010, 2011, and 2012.  Its public announcement of the toll rate increases used the following graphic:

PRIVILEGED AND CONFIDENTIAL

| Effective Friday, January 01, 2010 | | | | |
|---|---|---|---|---|
| Tolls | | | | |
| | Main Line Plaza | | Ramps | |
| 2-axle | $0.75 | $1.00 | $0.50 | $0.75 |
| 3-axle | $1.00 | $1.25 | $0.75 | $1.00 |
| 4-axle | $1.25 | $1.50 | $1.00 | $1.25 |
| 5-axle | $1.50 | $1.75 | $1.25 | $1.50 |
| 6-axle | $1.75 | $2.00 | $1.50 | $1.75 |

| Effective Saturday, January 01, 2011 | | | |
|---|---|---|---|
| Tolls | | | |
| | Main Line Plaza | | Ramps |
| 2-axle | $1.00 | $1.25 | $0.75 |
| 3-axle | $1.25 | $1.50 | $1.00 |
| 4-axle | $1.50 | $1.75 | $1.25 |
| 5-axle | $1.75 | $2.00 | $1.50 |
| 6-axle | $2.00 | $2.25 | $1.75 |

| Effective Sunday, January 01, 2012 | | | |
|---|---|---|---|
| Tolls | | | |
| | Main Line Plaza | | Ramps |
| 2-axle | $1.25 | $1.50 | $0.75 |
| 3-axle | $1.50 | $1.75 | $1.00 |
| 4-axle | $1.75 | $2.00 | $1.25 |
| 5-axle | $2.00 | $2.25 | $1.50 |
| 6-axle | $2.25 | $2.50 | $1.75 |

In other words, one-way tolls for a 2-axle vehicle (including the main plaza and the ramps) would increase in 2010 from $1.25 to $1.75; in 2011 from $1.75 to $2.00; and in 2012 from $2.00 to $2.25—nearly doubling the toll in a mere two years.

54.    In November 2012, MWAA adopted a resolution announcing another set of toll increases for 2013 and 2014, as reflected in charts accompanying the resolution.

55.    Effective January 1, 2013, the tolls would be increased as follows:

PRIVILEGED AND CONFIDENTIAL

| Vehicle Class | Tolls | |
|---|---|---|
| | Main Line Plaza | Ramps |
| 2-axle | ~~$1.50~~ $1.75 | ~~$0.75~~ $1.00 |
| 3-axle | ~~$1.75~~ $3.50 | ~~$1.00~~ $2.00 |
| 4-axle | ~~$2.00~~ $4.50 | ~~$1.25~~ $2.50 |
| 5-axle | ~~$2.25~~ $5.25 | ~~$1.50~~ $3.00 |
| 6 or more axles | ~~$2.50~~ $6.25 | ~~$1.75~~ $3.50 |

And effective January 1, 2014, the tolls would be increased as follows:

| Vehicle Class | Tolls | |
|---|---|---|
| | Main Line Plaza | Ramps |
| 2-axle | ~~$1.75~~ $2.50 | $1.00 |
| 3-axle | ~~$3.50~~ $5.00 | $2.00 |
| 4-axle | ~~$4.50~~ $6.25 | $2.50 |
| 5-axle | ~~$5.25~~ $7.50 | $3.00 |
| 6 or more axles | ~~$6.25~~ $8.75 | $3.50 |

In other words, one-way tolls for a 2-axle vehicle (including the main plaza *and* the ramps) would increase in 2013 from $2.25 to $2.75, and in 2014 from $2.75 to $3.50—another 50 percent increase in just two more years.

PRIVILEGED AND CONFIDENTIAL

56.     Finally, MWAA's website provides the following chart to illustrate the toll increases over the past years:

| Toll Rate History: 2-axle Vehicle Tolls By Calendar Year | | |
| --- | --- | --- |
| Year | At the Main Toll Plaza | At the On/Off Ramps |
| 2014 | $2.50 | $1.00 |
| 2013 | $1.75 | $1.00 |
| 2012 | $1.50 | $.75 |
| 2011 | $1.25 | $.75 |
| 2010 | $1.00 | $.75 |
| 2005 | $0.75 | $0.50 |
| 1984 | $0.50 | $0.25 ($0.35 at Route 28) |

*See* Dulles Toll Road Archived Toll Rates, *available at* http://www.dullestollroad.com/toll/archives.  As the chart shows, in the four years from 2010 to 2014, the overall one-way tolls for a 2-axle vehicle nearly tripled—from $1.25 to $3.50.  Those enormous increases were essential to MWAA's strategy of taking some $2.75 billion from Toll Road users to pay for the Dulles Metrorail Project.

## C.     MWAA projects further toll increases for funding the Dulles Metrorail Project.

57.     When announcing these various toll increases, MWAA's public hearing materials used graphics to explain what percentages of the increasing toll revenues would be spent on the Dulles Metrorail Project.

58.     This is the graphic addressing the 2010-2012 toll increases:

PRIVILEGED AND CONFIDENTIAL



59.     This is the graphic addressing the 2013-14 toll increases:

PRIVILEGED AND CONFIDENTIAL



60.    As the charts show, from 2010 to 2014, increasing percentages of toll revenues would be committed to financing the Dulles Metrorail Project. For instance, in 2014 approximately 61% of a projected $149 million in toll revenues were expected to fund the Dulles Metrorail Project.

61.    As the Dulles Metrorail Project has progressed, its total cost—and the amount of toll revenue to be used on construction—has increased.  Most recently, MWAA has estimated that $2.82 billion in tolls will be spent on the Dulles Metrorail Project, as the following MWAA chart shows:

PRIVILEGED AND CONFIDENTIAL

## Rail Project Costs are allocated in accordance with funding agreements

| SOURCES OF CAPITAL FUNDS $ Millions | PHASE 1 | PHASE 2 [(1)] | RAIL PROJECT BUDGET prior to NVTA funding | | RAIL PROJECT BUDGET after NVTA funding | |
|---|---|---|---|---|---|---|
| | | | Total | % of Total | Change | Total |
| Federal | $    900 | $       - | $    900 | 15.6% | | $    900 |
| Commonwealth of Virginia [(2)] | 252 | 323 | 575 | 10.0% | | 575 |
| Northern Virginia Transportation Authority [(3)] | | - | - | 0.0% | 33.0 | 33 |
| Fairfax County | 400 | 527 | 927 | 16.1% | (5.3) | 922 |
| Loudoun County | | 276 | 276 | 4.8% | (1.6) | 275 |
| MWAA (Aviation Funds) | | 236 | 236 | 4.1% | (1.4) | 235 |
| MWAA (Dulles Toll Road) | $  1,430 | $  1,415 | $  2,845 | 49.4% | (24.8) | $  2,820 |
| TOTAL SOURCES OF FUNDS | $  2,982 | $  2,778 [(4)] | $  5,760 | 100.0% | $       - | $  5,760 |

- Fixed Amount
- Fixed Percentage of total cost
- Residual

(1) Phase 2 Parking Garages are to be funded directly by the Counties and are not included in the Total Rail Project Budget.
(2) Does not include $150 million from the Commonwealth that is being used to pay interest on Dulles Toll Road revenue bonds.
(3) NVTA grant can only be used to pay or reimburse capital costs for Innovation Center Metrorail Station.
(4) Phase 2 Costs include $551 million in initially unallocated contingency.

See Dulles Corridor Advisory Committee Meeting, *Dulles Corridor Enterprise Financial Update* 3 (Dec. 3, 2015), *available at:* http://www.dullestollroad.com/sites/default/files/financial_update_12-03-2015.pdf. Thus, MWAA's current estimate of the amount of subsidy from Toll Road users to the Dulles Metrorail Project—over $2.8 billion—is even more than MWAA originally thought.

62.    MWAA projects the amount of toll revenue generated by Toll Road users based on the number of "transactions," with each transaction representing one trip by one vehicle on the Toll Road.

63.    The following chart outlines MWAA's estimates of how many transactions would take place in each year from 2009 to 2016, and the total toll revenues that would be generated for each year:

PRIVILEGED AND CONFIDENTIAL

| Dulles Toll Road Traffic and Toll Revenue Estimates 2009-2016 | | | |
|---|---|---|---|
| Year | Total Transactions | Average Revenue per Transaction | Total Revenue |
| 2016 | 99,775,000 | $1.57 | $156,972,000 |
| 2015 | 98,040,000 | $1.57 | $154,166,000 |
| 2014 | 96,454,000 | $1.57 | $151,601,000 |
| 2013 | 98,676,217 | $1.29 | $127,059,341 |
| 2012 | 99,891,072 | $1.02 | $101,596,089 |
| 2011 | 101,534,955 | $0.93 | $94,659,539 |
| 2010 | 104,686,184 | $0.84 | $88,038,167 |
| 2009 | 108,718,207 | [not listed] | $64,705,148 |

*See* Dulles Toll Road Comprehensive Traffic and Revenue Study 2014 Update at ES-6, available at: http://www.metwashairports.com/sites/default/files/archive/ mwaa.com/file/CTR_Study2014.pdf.

64.    MWAA estimates that planned toll increases will cause revenues from the Toll Road to rise even more in the future, from $161,425,000 in 2017 to $266,904,000 in 2026. *Id.* Over this same period, MWAA estimates that revenues will total over $2.21 billion—with most of that amount once again being used to finance the Metrorail Project. *Id.*

65.    MWAA also estimates that the number of annual transactions on the Dulles Toll Road will fluctuate between 92.5 million and 103.6 million over the next decade, with an average of 97.8 million transactions per year. *Id.* And each one of those millions of transactions will reflect a substantial subsidy from the affected Toll Road user to the eventual users of the Dulles Metrorail Project.

**PRIVILEGED AND CONFIDENTIAL**

66.    Yet, the foregoing description of the use of Dulles Toll Road revenues to subsidize the Dulles Metrorail Project does not tell the full story of the burden on Toll Road users.  MWAA has also funded other activities unrelated to the Metrorail Project with revenues exacted from Toll Road users.

67.    MWAA has committed approximately $30 million to VDOT to widen and improve State Route 606 in Loudoun County, Virginia.

68.    With revenues exacted from Toll Road users, MWAA has funded the expansion of its maintenance yard in West Falls Church and constructed a similar facility at Dulles to provide maintenance and repair services to rail cars owned by WMATA and used on rail lines other than the Silver Line.

69.    MWAA is also undertaking the procurement of rail cars for WMATA to be used on lines other than the Dulles Metrorail Project's Silver Line and funding the purchases with revenues exacted from Toll Road users.

70.    Finally, MWAA has established a real estate management and marketing program to develop land under its control that is not devoted to or necessary for the Dulles Metrorail Project or the two airports that MWAA operates, again relying on money exacted from Toll Road users to pay for these enterprises.

## VI.    Investigations of MWAA emphasize MWAA's federal character.

71.    MWAA has been the subject of repeated investigations by the U.S. Department of Transportation because of MWAA's questionable procurement practices, mismanagement, waste, and general lack of accountability.

**PRIVILEGED AND CONFIDENTIAL**

72.     For instance, in July 2012, U.S. Secretary of Transportation Ray LaHood sent a letter to MWAA demanding that MWAA open its books and records to the USDOT Inspector General.  Letter form Ray LaHood to Michael A. Curto and John      E.      Potter,      Jul.      31,      2012,      available      at: http://www.metwashairports.com/sites/default/files/archive/mwaa.com/file/LaHood. Curto_7.31.12.pdf.  Secretary LaHood explained that MWAA is a "public body" that operates "Federal interests."  *Id.*  The Secretary's letter noted "significant concerns about MWAA's policies and procedures in contracting, ethics, and travel, and the lack of transparency and accountability in the activities of MWAA's Board of Directors."  *Id.*  Consequently, the Secretary appointed an Accountability Officer and demanded she be given "access to [MWAA's] personnel and documents" as well as "access to … all Board of Directors meetings … including general and closed sessions." *Id.*

73.     Similarly, in an October 2012 letter, the Deputy U.S. Secretary of Transportation, John D. Porcari, referred to MWAA as "a public body entrusted with the management and operation of important Federal assets."  See Letter from USDOT Deputy Secretary John D. Porcari to Inspector General Calvin L. Scovel III (October 18, 2012) (attached as an appendix to USDOT Office of the Inspector General Audit Report, *MWAA's Weak Policies and Procedures Have Led to Questionable Procurement Practices, Mismanagement, and A Lack of Overall Accountability* 48, 48 (2012) ("2012 IG Report")).  Continuing in this vein, the Deputy Secretary stated: "As established by statute, MWAA is a public entity with

PRIVILEGED AND CONFIDENTIAL

considerable autonomy. While the Department will continue to hold MWAA accountable in its management and operation of *vitally important Federal assets*, it is primarily incumbent on MWAA to institute the reforms needed to regain the public's trust." *Id.* (appendix at 50) (emphasis added).

74. MWAA's insulation from political accountability has led to predictable mismanagement, corruption, and self-dealing.

75. In November 2012 the USDOT's Inspector General released an Audit Report that was entitled: "MWAA's Weak Policies and Procedures Have Led to Questionable Procurement Practices, Mismanagement, and a Lack of Overall Accountability." The Report cautions that, "[a]s an independent public body subject to few Federal and State laws, MWAA must rely on the strength of its policies and processes to ensure credibility in its management of two of the Nation's largest airports and a multibillion-dollar public transit construction project." 2012 IG Report at 38. Nonetheless, the Report concluded that "MWAA's ambiguous policies and ineffectual controls have put these assets and millions of Federal dollars at significant risk of fraud, waste, and abuse and have helped create a culture that prioritizes personal agendas over the best interests of the Authority." *Id.*

76. This lack of accountability and transparency has led to unethical and fiscally wasteful practices.

77. For example, the DOT Inspector General has found MWAA's spending of federal funding for the Dulles Metrorail Project to include both "unsupported and unallowable costs." Department of Transportation Office of Inspector General Audit

PRIVILEGED AND CONFIDENTIAL

Report, *MWAA's Financial Audit Controls are not Sufficient to Ensure Eligibility of Expenses on FTA's Dulles Rail Project Grant* 3 (2014).   Unsupported costs have totaled about 36 percent of federal funding during towards the Metrorail project, or some $139 million.   *Id.*   And unallowable costs—such as spending on lobbyists— have totaled an additional $350,000. *Id.*

78.     The Inspector General has also found MWAA's contracting practices to be anti-competitive and unethical.  2012 IG Report at 2.  Moreover, the Inspector General directly linked these issues to the contracts that MWAA is awarding on the Metrorail Project.   *Id.* at 18.  As the report states, through 2011 "new contracts awarded by the Procurement and Contracts Department increased an average of 47 contracts annually due to the Dulles Toll Road and Dulles Metrorail project."  *Id.*

79.     In short, not only are Toll Road users being required to cross-subsidize eventual customers of the Metrorail Project and to pay for other activities unrelated to the Toll Road, but those users are also being required to pay even larger subsidies than they would if MWAA were managed in a competent, ethical manner.

## VII.   Congress authorizes MWAA to undertake new functions and activities unrelated to the operation of airports.

80.     At MWAA's urging, Congress amended the Airports Act in 2012 to add a provision to the definition of "airport purposes" that governs MWAA's use of its property interests. That new provision authorizes MWAA to engage in "a business or activity not inconsistent with the needs of aviation that has been approved by the Secretary."  49 U.S.C. § 49104(a)(2)(B)(iv).

PRIVILEGED AND CONFIDENTIAL

81.    MWAA and the Secretary promptly amended the lease for the airports to reflect these expanded new powers.

82.    Which businesses or activities are encompassed within this new authority is simply a matter of the collective discretion of MWAA and the Secretary. Congress has not in any significant way circumscribed the choices MWAA and the Secretary may make in exercising this authority.

## VIII. MWAA purports to exercise authority pursuant to the Compact Clause.

83.    Over the three decades of its existence, MWAA has repeatedly and publicly claimed that its authority derives from an interstate compact to which Congress has allegedly consented under the Compact Clause.

84.    MWAA's own documents make this claim. For instance, in the 1987 lease granting MWAA control of Washington National and Dulles airports, MWAA described itself as a "public body politic and corporate formed by a compact between the Commonwealth of Virginia and the District of Columbia." MWAA—USDOT Lease Agr., at 1 (Mar. 2, 1987).

85.    Similarly, the documents effecting the transfer of the Toll Road to MWAA express the view that MWAA is solely a creature of the "interstate compact between the Commonwealth of Virginia and the District of Columbia."  Dulles Toll Road Permit and Operating Agreement, at 1 (Dec. 29, 2006).  *See also* Master Transfer Agreement, at 11 (Dec. 29, 2006) (MWAA was "created by interstate compact between the Commonwealth of Virginia and the District of Columbia … and has the requisite power … to carry on its present and proposed activities.");

PRIVILEGED AND CONFIDENTIAL

Assignment and Assumption Agreement, at 1 (June 28, 2007) (MWAA was "created by interstate compact between the Commonwealth of Virginia and the District of Columbia.").

86.    In 2011, MWAA's outside counsel, Jenner & Block, advised MWAA that an expansion of the MWAA Board directed by recently passed federal legislation could not "constitutionally" take effect until enacted by Virginia and the District of Columbia because, in counsel's view, "the Board is a creature of the interstate compact between Virginia and the District of Columbia."

87.    MWAA has also repeatedly made this claim in federal litigation.  For example, over 25 years ago in *CAAN,* MWAA vigorously rejected the notion that the ground for its legal authority was "suddenly federalized" because Congress approved the purported compact between Virginia and the District of Columbia.  Rather, MWAA argued that it would not have any authority to function if not "empowered by" the Virginia and District of Columbia enabling statutes which embody the compact.  Brief for the Petitioners, 1991 WL 521281, *18-19, *CAAN* (filed March 1, 1991).

88.    Likewise, in 2012 MWAA argued to the United States Court of Appeals for the Federal Circuit that it is not an agency or instrumentality of the United States because it "was created in 1985 by an interstate compact between the Commonwealth of Virginia and the District of Columbia."  Brief of Appellee, at 13, *Corr v. MWAA,* No. 2011-1501 (Fed. Cir. filed April 23, 2012).

PRIVILEGED AND CONFIDENTIAL

89.   More recently, MWAA told the United States Supreme Court that its authority to manage the Toll Road—including its authority to exact money from Toll Road users to subsidize the Dulles Metrorail Project—flows from its status as an interstate compact entity under the Compact Clause.  *See* MWAA Br. in Opp., at 4, *Corr v. MWAA*, No. 13-1559 (U.S. filed Nov. 17, 2014) (stating that "Virginia and the District of Columbia adopted legislation in 1985 to form MWAA … using the Compact Clause," and that Congress "approved MWAA's compact" in 1986); *id.* at 8 (stating that, "consistent with ... MWAA's interstate compact," MWAA's agreement with Virginia authorized MWAA to "construct the Metrorail project and operate the Dulles Toll Road").

90.   In sum, MWAA has justified its authority by claiming, publicly and repeatedly, to be a "standard interstate compact entity, formed with Congress' consent under the Compact Clause."  *Id.* at 18.

91.   The United States Justice Department has also claimed that MWAA's authority—including its authority to exact money from Toll Road users to subsidize the Dulles Metrorail Project—flows from the Compact Clause.

92.   For instance, in 2014, the Department told the United States Fourth Circuit Court of Appeals that "Compact Legislation clearly authorizes MWAA to charge tolls and use the proceeds for construction of the Metrorail extension."  Br. of United States as *Amicus Curiae*, at 4, 12, in *Corr v. MWAA*, No. 13-1076 (4th Cir. filed July 25, 2013).

**PRIVILEGED AND CONFIDENTIAL**

93.    Similarly in 2015, the United States Solicitor General told the U.S. Supreme Court that MWAA was created in 1985 by "compact legislation" enacted by Virginia and the District.  Br. for United States as *Amicus Curiae*, at 2, in *Corr v. MWAA*, No. 13-1559 (U.S. filed May 22, 2015).

94.    At the same time, however, the Solicitor General referred to the "concededly *sui generis* nature of the [MWAA] compact," and asserted only that the "compact is *materially similar* to compacts between two or more States to which Congress has consented under the Compact Clause."  *Id.* at 7, 8 (emphasis added). In short, the Solicitor General expressed doubt as to whether MWAA was a true Compact Clause entity.

95.    At bottom, since its inception, MWAA has been operating in a legal and political never-land, outside the constraints of legal and political accountability imposed by the Constitution and federal law.  And that lack of accountability has allowed MWAA to exact enormous unwarranted subsidies from Toll Road users, who are represented by the Plaintiff class in this litigation.

## CLASS ACTION ALLEGATIONS

96.    Plaintiffs bring this lawsuit as a class action on their own behalf and on behalf of all other persons similarly situated as members of the proposed Class, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), and/or (b)(1), (b)(2), and/or (c)(4).  This action satisfies the numerosity, commonality, typicality, predominance, and superiority requirements of those provisions.

97.    The proposed Classes are defined as:

PRIVILEGED AND CONFIDENTIAL

## Nationwide Class

All persons or entities in the United States who paid tolls for the use of the Dulles Toll Road from November 2008 to the present.

## Transponder Subclass

All persons or entities in the Nationwide Class who paid tolls through an electronic transponder system, such as "E-Z Pass" system.

## Cash Subclass

All persons or entities in the Nationwide Class who paid tolls in cash.

98.     Excluded from the Classes are (A) all Defendants and their officers, directors, employees, agents, and legal representatives; and (B) the Judge to whom this case is assigned and the Judge's staff.  Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that any Class should be expanded, divided into additional subclasses, or modified in any other way.

## Numerosity and Ascertainability

99.     Although the exact number of Class members is uncertain, the size of the Classes can be estimated with reasonable precision, and the number is great enough that joinder is impracticable.

100.     According to MWAA statistics, between 95 million and 105 million transactions take place on the Dulles Toll Road each year.  This means that, over the period since MWAA began managing the Toll Road, more than 700 million transactions have taken place.

PRIVILEGED AND CONFIDENTIAL

101.   Furthermore, the identities of the Class and Subclasses can be reasonably identified through information in the possession of MWAA, its agents, and governmental agencies, or alternatively through publication.

102.   With respect to the Transponder Subclass, approximately 85 percent of the tolls collected on the Dulles Toll Road are paid via an electronic transponder system such as "EZ-Pass." *See* Dulles Corridor Enterprise Financial Report April 2016, available at: http://www.mwaa.com/sites/default/files/BOD/2016-05/tab_5_april_2016_financial_report_-_dulles_corridor_enterprise.pdf.   There are more than 900,000 active E-Z Pass transponders issued by VDOT alone. The identity and contact information of each member of the Transponder Subclass can be readily determined from personal data maintained by MWAA, VDOT, and governmental agencies in other states who issue similar transponders.

103.   With respect to the Cash Subclass, on information and belief MWAA tracks every car that passes through toll plazas and has the ability to ascertain the license plate numbers of virtually all of its customers who paid cash.   Moreover, those customers who have paid with cash can be found by publication as well. Finally, many of these customers may have independent records confirming their use of the Toll Road.

104.   In sum, the number of Class members is likely in the millions, and the disposition of the Class members' claims in a single action will provide substantial benefits to all parties and to the Court.   Class members are readily identifiable from information and records in possession, custody, or control of MWAA, governmental

PRIVILEGED AND CONFIDENTIAL

agencies such as VDOT, and the Class members themselves.  Class members are also identifiable through publication.

## Typicality

105.   The claims of the representative Plaintiffs are typical of the claims of the Classes in that the representative Plaintiffs, like all Class members, have used the Toll Road since MWAA began operating it November 2008 and, as a result, have suffered the illegal exaction by MWAA of artificially inflated tolls designed to fund the Metrorail Project.

## Adequate Representation

106.   Plaintiffs are members of the Classes and will fairly and adequately represent and protect the interests of the Classes.  Plaintiffs' counsel have substantial experience in litigating complex issues of constitutional and administrative law both on behalf of, and against, governmental entities.  Plaintiffs' counsel also have substantial experience in class action litigation.

107.   Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Classes and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests in conflict with that of the interests of the Classes.

## Predominance of Common Issues

108.   There are numerous issues of law and fact common to Plaintiffs and Class members that predominate over any issue affecting only individual Class

**PRIVILEGED AND CONFIDENTIAL**

members. Resolving these common issues will advance resolution of the litigation as to all Class members. These common legal and factual issues include, for example:

    a.   whether MWAA is a valid interstate compact entity under the Compact Clause;

    b.   whether MWAA's exercise of legislative and executive power violates the separation of powers required by the U.S. Constitution;

    c.   whether Congress unconstitutionally delegated legislative and regulatory authority to MWAA;

    d.   whether MWAA has exacted money from Class members in violation of the Due Process Clause of the Fifth Amendment;

    e.   whether MWAA and/or the Secretary have acted in violation of the Administrative Procedure Act; and

    f.   whether operation of the Toll Road to fund the Metrorail Project is an "airport purpose" under the Airports Act and under MWAA's lease.

## Superiority

109.   Plaintiffs and Class members have all suffered—and will continue to suffer—harm as a result of MWAA's unlawful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

110.   Absent a class action, most Class members would likely find the cost of litigating their claims prohibitively high and would have no effective remedy at law. Because of the relatively small size of the individual Class members' claims, it is likely that few, if any, Class members could afford to seek legal redress for MWAA's

PRIVILEGED AND CONFIDENTIAL

misconduct.  Absent a class action, the harms to Class members will go unremedied, and MWAA's misconduct will continue without remedy.

111.    Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

112.    MWAA has acted in a uniform manner with respect to the Plaintiffs and Class members.

113.    Classwide, declaratory, equitable, and injunctive relief is appropriate under Rule 23(b)(1) and/or (b)(2) because MWAA has acted on grounds that apply generally to the class, and inconsistent adjudications with respect to MWAA's liability would establish incompatible standards and substantially impair or impede the ability of Class members to protect their interests. Classwide relief assures fair, consistent, and equitable treatment and protection of all Class members, and uniformity and consistency in MWAA's discharge of their duties to perform corrective action regarding the illegally exacted tolls.

PRIVILEGED AND CONFIDENTIAL

## CLAIMS FOR RELIEF

### Count One: Compact Clause
**Because MWAA is not a valid interstate compact entity, it lacks the necessary authority to force the Plaintiff class to subsidize the Dulles Metrorail Project.**

114.    Plaintiffs hereby incorporate by reference all preceding paragraphs of the Complaint.

115.    The Compact Clause of the United States Constitution provides that "[n]o State shall, without the Consent of Congress, . . . enter into any Agreement or Compact with another State[.]"  U.S. Const. art. I, § 10, cl. 3.  The Clause requires "an agreement among sovereign States," *Alabama v. North Carolina*, 560 U.S. 330, 352 (2010), to which Congress gives its consent.

116.    MWAA purports to derive its authority from an interstate compact between the District of Columbia and Virginia, to which it claims Congress has consented under the Compact Clause.

117.    More specifically, MWAA has sought to justify its authority to manage the Toll Road—including its purported authority to force Toll Road users to subsidize the costs of the Metrorail Project through artificially inflated tolls—by relying on its alleged status as a Congressionally-approved interstate compact entity under the Compact Clause.

118.    MWAA, however, is not a valid interstate compact entity under the Compact Clause.  First, that is because the District of Columbia—one of the two government entities purporting to form the compact creating MWAA—is not a "State" for purposes of the Compact Clause.  *See, e.g., Adams v. Clinton*, 90 F.Supp.

40

PRIVILEGED AND CONFIDENTIAL

2d. 35, 47-50 (D.D.C. 2000) (per Garland, J.) (concluding that the District of Columbia is not a "State" for purposes of Article I); *see also, e.g., Palmore v. United States*, 411 U.S. 389, 395 (1973) ("The District of Columbia is constitutionally distinct from the States . . . ."); *District of Columbia v. Carter*, 409 U.S. 418, 420 (1973) (explaining that the District is "truly *sui generis* in our governmental structure" and holding that the District is not a "State or Territory" for purposes of 42 U.S.C. § 1983).

119.   Moreover, the inapplicability of the Compact Clause to the District of Columbia is not simply a matter of nomenclature.   Unlike a State, the District of Columbia is not considered a sovereign within our constitutional order.   Instead, in contrast to a sovereign State, the District of Columbia is an entity to whom executive and legislative powers have been delegated by Congress.   *See* D.C. CODE §§ 1-203.02, 1-203.22.   In that constitutional posture, the District of Columbia does not have the authority to enter into any sort of intergovernmental agreement that purports to create an entity like MWAA, give it the kind of powers purportedly delegated to MWAA, and then insulate MWAA from accountability to the President or other federal officers by decreeing MWAA's "independence."   *Cf. Free Enterprise Fund v. Public Accounting Oversight Bd.,* 561 U.S. 477 (2010).

120.   And the statute by which Congress has expressed its consent to interstate compacts regarding the operation of airports, 49 U.S.C. § 40124, reflects the underlying premise of the Compact Clause, expressly stating that the "Congress

consents to a *State* making an agreement … with another *State* to develop or operate an airport facility."  (Emphases added.)

121.   Because the District is not a "State" for purposes of the Compact Clause, MWAA's authority to manage the Toll Road—including its claimed authority to exact excessive fees from toll road users to subsidize the Dulles Metrorail Project—cannot flow from the Compact Clause, which is MWAA's only claimed source of power to exercise that authority.

122.   Because MWAA is not a valid interstate compact entity, Congress could not and cannot validly confer upon MWAA the authority to force Toll Road users to subsidize the Dulles Metrorail Project's cost and the cost of other activities undertaken by MWAA that are not related to the Dulles Metrorail Project or the Toll Road through artificially inflated tolls.

123.   MWAA's attempt to implement that policy is therefore without legal authority and should be set aside.

**Count Two: Compact Clause**
**Federal authority may not be delegated to an interstate compact entity.**

124.   Plaintiffs hereby incorporate by reference all preceding paragraphs of the Complaint.

125.   Congress has made an unprecedented delegation to MWAA of significant federal authority not appropriate for a compact entity.  The purpose of an interstate compact, and any entity created by one, is to "address interests and problems that do not coincide nicely either with the national boundaries or with State lines." *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 40 (1994)

**PRIVILEGED AND CONFIDENTIAL**

(internal quote marks omitted).  Thus compacts are fashioned to establish "regional solutions" to "regional problems."  Felix Frankfurter & James M. Landis, *The Compact Clause of the Constitution—A Study in Interstate Adjustments*, 34 YALE L.J. 685, 708 (1925).

126.   MWAA, in stark contrast, was created at the instigation of Congress to address a distinctively congressional need: to get non-federal dollars to develop Reagan and Dulles Airports while maintaining some congressional control over them.  *See CAAN*, 501 U.S. at 257 n.3.  No regional concern motivated MWAA's creation, for there was "no question that the daily management of the airports by the . . . FAA ha[d] been excellent." *Id.* (quoting S.Rep. No. 99-193, p. 2 (1985)).  Indeed, Congress staunchly resisted simply selling the airports to another governmental or a private entity.  *See* J. Fischer, *Federal Ownership of National and Dulles Airports: Background, Pro-Con Analysis, and Outlook* 3-5 (1985), *reprinted in* Hearings before the Subcomm. on Govt'l Efficiency and the District of Columbia, 99th Cong. 402-405 (1985).  As the Supreme Court has underscored, "the Federal Government has a strong and continuing interest in the efficient operation of the airports, which are vital to the smooth conduct of Government business, especially to the work of Congress." *CAAN*, 501 U.S. at 266.  In fact, the agreement creating MWAA is more accurately characterized as an agreement between the Commonwealth of Virginia and the United States, which by definition is not an interstate compact.

PRIVILEGED AND CONFIDENTIAL

127.   Because the federal authority delegated to MWAA is improper under the Compact Clause, MWAA's authority to manage the Toll Road—including its claimed authority to exact excessive fees from toll road users to subsidize the Dulles Metrorail Project—cannot flow from the Compact Clause, which is MWAA's only claimed source of power to exercise that authority.

128.   Accordingly, Congress could not and cannot validly confer upon MWAA the authority to force Toll Road users to subsidize the Dulles Metrorail Project's cost and the cost of other activities undertaken by MWAA that are not related to the Dulles Metrorail Project or the Toll Road through artificially inflated tolls.

129.   MWAA's attempt to implement that policy is therefore without legal authority and should be set aside.

### Count Three: Non-Delegation Doctrine/Article I
### Congress unconstitutionally delegated federal legislative and regulatory power to MWAA.

130.   Plaintiffs hereby incorporate by reference all preceding paragraphs of the Complaint.

131.   As the Justice Department has conceded, MWAA was created "by federal command," and its "powers and authority … were, and still are, dictated by Congress."  Brief for the Intervenor United States, *Hechinger v. MWAA,* 36 F.3d 97 (D.C. Cir. 1994) (No. 94-7036), 1994 WL 16776877, at *11.

132.   The Constitution prohibits Congress from delegating its legislative authority. *See, e.g., Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (explaining that the "text [of Article I § 1] permits no delegation of [legislative] powers").

PRIVILEGED AND CONFIDENTIAL

133.   Congress may delegate decisionmaking or regulatory authority to a federal agency, but only if Congress "'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform.'" *Whitman*, 531 U.S. at 472 (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)).

134.   The Constitution prohibits Congress from delegating decisionmaking or regulatory authority to a private entity. *See, e.g., Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936).

135.   The same principle prohibits Congress from delegating decisionmaking or regulatory authority to a public entity that federal law makes entirely independent of the authority of the United States Government.

136.   Congress is also prohibited from delegating such broad powers to a public entity so as to enable that entity to determine for itself the scope of its activities and functions.

137.   Regardless of whether MWAA is considered a valid interstate compact entity, a federal agency or instrumentality, or some hitherto unknown type of entity, Congress's delegation of federal legislative and regulatory authority to MWAA in the Airports Act violates each one of these non-delegation principles.

138.   By delegating to MWAA the federal legislative authority to choose what facilities it will build and enterprises it will initiate and spend its revenues on, to levy taxes and set the rate of taxation to generate those revenues, and to exercise

PRIVILEGED AND CONFIDENTIAL

eminent domain and police powers, the Airports Act violates the non-delegation doctrine.

139.   Additionally, by delegating federal regulatory authority to MWAA, an entity that federal law makes "independent of … the United States Government," 49 U.S.C. § 49106(a)(2), the Airports Act violates the non-delegation doctrine.

140.   In the alternative, to the extent MWAA may be considered a federal agency, the Airports Act violates the non-delegation doctrine by delegating regulatory authority to MWAA without laying down by statute an intelligible principle to which MWAA must conform.   At best, what Congress articulated in the Airports Act were standards for further legislation by MWAA.

141.   The Airports Act's delegation of powers to MWAA unaccompanied by effective statutory limitation has allowed and will continue to allow MWAA to expand its mission, functions and activities as it chooses.   Indeed, the 2012 amendment to the Airports Act that modified the definition of "airport purposes" by adding a provision, 49 U.S.C. § 49104(a)(2)(B)(iv), allowing MWAA to engage in activities and functions that are "not inconsistent with the needs of aviation" is so broad that there are very few activities and functions that MWAA would be prohibited from undertaking.   By itself, therefore, that added provision is a violation of the non-delegation doctrine, and is unconstitutional.

142.   Accordingly, regardless of how MWAA is legally characterized as an entity, MWAA's exactions that compel Toll Road users to subsidize the Dulles

PRIVILEGED AND CONFIDENTIAL

Metrorail Project through artificially inflated tolls are unlawful, must be set aside, and appropriate restitution made.

### Count Four: Separation of Powers / Article I
### MWAA exercises federal legislative power in violation of Article I.

143.   Plaintiffs hereby incorporate by reference all preceding paragraphs of the Complaint.

144.   In addition to the fact that federal legislative power has been unconstitutionally delegated to MWAA either because it is not a valid interstate compact entity or, more broadly, under the non-delegation doctrine, MWAA's exercise of that power independently violates the Constitution.

145.   Article I, § 1 of the United States Constitution vests "[a]ll legislative Powers herein granted … in a Congress of the United States."  Among the powers included within Congress's legislative power are the powers to "provide for the common defense and general welfare of the United States" (the spending power), and to "lay and collect taxes, duties, imposts and excises" (the taxing power).  U.S. Const. Art. I, § 8, cl. 1.

146.   The exercise of the legislative power to spend for the general welfare requires an exercise of judgment as to what measures will advance general public purposes.  It includes the drawing of lines "between one welfare and another, between particular and general."  *Helvering v. Davis,* 301 U.S. 619, 640-41 (1937).  The exercise of this judgment may involve the imposition of reasonable conditions on the use of public funds or public facilities.  *See Ivanhoe Irr. Dist. v. McCracken*, 357 U.S. 275, 295 (1958); *S. Dakota v. Dole*, 483 U.S. 203, 207-08 (1987).

PRIVILEGED AND CONFIDENTIAL

147.   Moreover, the exercise of the legislative power to exact taxes includes both selecting the subjects of the taxation, and also setting the relevant rates.  *See, e.g., Sonzinsky v. United States*, 300 U.S. 506, 512 (1937) ("Congress may select the subjects of taxation, choosing some and omitting others.").   As a constitutional matter, the essential feature of a tax is to "produce[ ] … revenue for the Government."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2594 (2012) (citing *United States v. Kahringer*, 345 U.S. 22, 28 n.4 (1953)).   Exercising this taxing power is quintessentially a legislative function.

148.   All exercises of the legislative power delegated by the Constitution— whether it relates to spending or taxation—are subject to the constitutional requirement that legislation be passed by both houses of Congress and presented to the President.  *See* U.S. Const. art. I, § 7, cl. 2 (providing that "[e]very Bill which shall have passed the House of Representatives and the Senate shall, before it becomes a law, be presented to the President of the United States"); *see also, e.g., INS v. Chadha*, 462 U.S. 919, 946 (1983) (observing that these bicameralism and presentment requirements of Article I "are integral parts of the constitutional design for the separation of powers").

149.   The jurisdiction in which MWAA exercises this legislative power covers an area far larger than the airports proper, stretching 24 miles along the Dulles Corridor.  *See* 49 U.S.C. § 49103(4); *see also* 65 Fed. Reg. 39,466, 39,467 (June 26, 2000).   Within that expansive grant, MWAA has the prerogative to do anything with its real property to advance so-called "airport purposes."   49 U.S.C. §

PRIVILEGED AND CONFIDENTIAL

49104(a)(2)(B).  However, the text of the statute purports to include within "airport purposes," not just "aviation business or activities," *id.* § 49104(a)(2)(A)(i), and activities necessary to support "air commerce," *id.* § 49104(a)(2)(A)(ii), but *any* "business or activity" that MWAA and the Secretary of Transportation agree are "not inconsistent with the needs of aviation." *Id.* § 49104(a)(2)(A)(iv).  As previously noted, the latter provision is invalid as a violation of the non-delegation doctrine.

150.   In aid of MWAA's mission Congress has also given MWAA a variety of broad powers.  For instance,

     a.  MWAA can "acquire, maintain, improve, operate, protect, and promote" the airports as it sees fit, 49 U.S.C. § 49106(b)(A);

     b.  MWAA can "acquire real or personal property," *id.* § 49106(b)(C);

     c.  MWAA can "issue bonds from time to time in its discretion," *id.* § 49106(b)(B), to finance its spending on acquisitions, improvements and operations; and

     d.  MWAA can "levy fees or other charges" to generate the revenue it needs to support its spending and the bonds financing that spending. *Id.* § 49106(b)(E).

151.   MWAA's unconstrained power to choose what facilities it will build, and how it will generate the revenue to pay for them—MWAA's legislative prerogative—is nowhere better on display than in its control of the Dulles Metrorail Project construction.  According to the Washington Metropolitan Area Transit Authority, that project is the "largest and one of the most complex transportation

**PRIVILEGED AND CONFIDENTIAL**

projects in the United States."  As described above, MWAA has chosen to rely on money exacted from Toll Road drivers to pay for the largest portion of the multi-billion-dollar—and seemingly ever-growing—cost of the Dulles Metrorail Project. Thus, at the prerogative of MWAA, huge sums are being exacted from citizens using one facility (and mode of transportation) to pay for a different facility (and different mode of transportation) that they are not using, and may never use.

152.   Similarly illustrating the extent of MWAA's prerogative was its decision in April 2011 to build an underground station for the Dulles Metrorail Project's Silver Line at the Dulles terminal.  MWAA made this choice even though an underground station would cost $330 million more than an above-ground station and significantly delay the expected opening day for the Dulles Metrorail Project. Only after an extended uproar from local and state leaders did MWAA back down nearly a year later and opt for the above-ground facility.

153.   MWAA's claimed authority to spend on anything that it deems might "improve" or "promote" or "protect" Reagan and the Dulles Corridor, and on any "business or activity not inconsistent with the needs of aviation" (and also approved by the Secretary of Transportation) constitutes an exercise of the spending power under Article I, section 8 of the Constitution.

154.   The exercise of MWAA's authority to exact money from Toll Road users at levels needed to finance MWAA's spending on its chosen projects, especially the Dulles Metrorail Project, constitutes an exercise of the power of taxation under Article I, section 8 of the Constitution.

PRIVILEGED AND CONFIDENTIAL

155.   The independent exercise by MWAA of these federal legislative powers has never been subject to the bicameralism and presentment requirements of Article I of the Constitution.

156.   For example, no law respecting the exaction of money from Toll Road motorists to fund the Dulles Metrorail Project or other activities has ever passed both houses of Congress or been presented to the President.

157.   Similarly, no law respecting the levels of those exactions from Toll Road motorists to fund the Dulles Metrorail Project or other activities has ever passed both houses of Congress or been presented to the President.

158.   Consequently, regardless of whether MWAA is a valid interstate compact entity, MWAA's purported exercise of the federal spending and taxing powers violates the bicameralism and presentment requirements of Article I of the Constitution.   Accordingly, MWAA's exactions from Toll Road drivers to subsidize the costs of the Dulles Metrorail Project and of other activities unrelated to the use of the Toll Road through artificially inflated tolls are unlawful and must be set aside.

### Count Five: Separation of Powers / Article II
### MWAA exercises federal executive power in violation of Article II.

159.   Plaintiffs hereby incorporate by reference all preceding paragraphs of the Complaint.

160.   Article II of the United States Constitution "vests '[t]he Executive power … in a President of the United States of America, who must 'take Care that the Laws be faithfully executed.'"   *Free Enter. Fund v. Pub. Co. Accounting*

PRIVILEGED AND CONFIDENTIAL

*Oversight Bd.*, 561 U.S. 477, 483 (2010) (quoting U.S. Const. Art. II, § 1, cl. 1; *id.* § 3).

161.    Article II also gives the President power to "nominate, and by and with the Advice and Consent of the Senate … [to] appoint" all "Officers of the United States." U.S. Const. Art. II, § 2, cl. 2. Congress, however, "may by law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." *Id.*

162.    Generally speaking, an "inferior Officer" within the meaning of Article II, § 2—one whose appointment Congress may vest in the President, courts, or department heads—is an officer "whose work is directed and supervised at some level by others who were appointed by presidential nomination with the advice and consent of the Senate." *Edmond v. United States*, 520 U.S. 651, 663 (1997).  By contrast, a "principal" Officer—one who may be appointed only by the President—is "an officer who acts without supervision." *Dep't of Transp. v. Ass'n of Am. R.R.*, 135 S. Ct. 1225, 1238 (2015) (Alito, J., concurring) (citing *Edmond*, 620 U.S. at 663).

163.    Whether "inferior" or "principal," however, "any appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,' and must, therefore be appointed in the manner prescribed by [Article II] § 2, cl. 2[.]" *Buckley v. Valeo*, 424 U.S. 1, 126 (1976).

164.    Federal law requires that MWAA be governed by a 17-member Board of Directors. 49 U.S.C. § 49106(c). However, only three of those Board members are appointed by the President with the advice and consent of the Senate. *Id.*

PRIVILEGED AND CONFIDENTIAL

§ 49106(c)(1)(D).   The remaining 14 members are appointed by the governors of Maryland and Virginia and by the mayor of the District.  *Id.* § 49106(c)(1)(A)-(C).

165.   The MWAA Board of Directors exercises "executive authority" within the meaning of Article II of the Constitution.

166.   Regardless of whether MWAA is a valid interstate compact entity, MWAA thus violates the Take Care and Appointments Clauses of Article II.

167.   Because the President of the United States controls only three of the 17 members of the MWAA Board of Directors, by definition the President cannot "take Care" that MWAA is "faithfully execut[ing]" the laws of the United States.

168.   Furthermore, regardless of whether MWAA's Board members constitute "principal" or "inferior" Officers of the United States, their manner of appointment violates the Appointments Clause.

169.   To the extent MWAA's Board members constitute "principal Officers" under Article II, then MWAA violates Article II because 14 of the 17 members are not appointed by the President of the United States.

170.   To the extent MWAA's Board members constitute "inferior Officers" under Article II, then MWAA violates Article II because Congress has vested the appointment of 14 of 17 members in neither the President, the courts of law, or the head of a Department.

171.   Accordingly, regardless whether MWAA is a valid Compact Clause entity, MWAA's attempt to force Toll Road users to pay a disproportionate share of

PRIVILEGED AND CONFIDENTIAL

costs of the Dulles Metrorail Project and other activities through artificially inflated tolls is unlawful and must be set aside.

### Count Six: Due Process Clause / Fifth Amendment
**MWAA exacts taxes from Toll Road users in violation of due process.**

172.   Plaintiffs hereby incorporate by reference all preceding paragraphs of the Complaint.

173.   The Fifth Amendment to the United States Constitution provides that "[n]o person shall … be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

174.   The Due Process Clause prohibits the federal government from exacting or retaining money from persons in contravention of the Constitution, a statute, or a regulation.

175.   MWAA has been authorized by federal law to "levy fees or other charges," 49 U.S.C. § 49106(b)(1)(E), and has used this authority to exact and retain money from Toll Road users to subsidize the Dulles Metrorail Project and other activities unrelated to the use of the Toll Road.  Pursuant to the agreement under which MWAA manages the Toll Road, all toll revenues are the property of MWAA.

176.   By exacting and retaining these fees, MWAA exercises federal authority in contravention of the Constitution and federal law, as described above.

177.   MWAA's illegal exaction and retention of fees from motorists to subsidize the Dulles Metrorail Project and other activities unrelated to the use of the Toll Road violates the Due Process Clause.

PRIVILEGED AND CONFIDENTIAL

178.   Accordingly, regardless whether MWAA is a valid Compact Clause entity, MWAA's attempt to force Toll Road users to subsidize the costs of the Dulles Metrorail Project and other activities unrelated to the use of the Toll Road through artificially inflated tolls is unlawful, must be set aside, and appropriate restitution made.

### Count Seven: Violation of MWAA's Enabling Legislation
**MWAA's actions exceed its authority under the Airports Act, properly construed.**

179.   Plaintiffs hereby incorporate by reference all preceding paragraphs of the Complaint.

180.   The Airports Act authorizes MWAA to "operate, maintain, protect, promote, and develop the Metropolitan Washington Airports as a unit and as primary airports serving the Metropolitan Washington area." 49 U.S.C. § 49104(a)(1).

181.   Furthermore, MWAA is authorized to use the leased property interests "only for airport purposes." *Id.* § 49104(a)(2)(A)(iv), (B).

182.   "Airport purposes" is defined by statute as use of property interests (except for sale) for (i) "aviation business or activities"; (ii) "activities necessary or appropriate to serve passengers or cargo in air commerce"; (iii) "nonprofit, public use facilities that are not inconsistent with the needs of aviation"; or (iv) "a business or activity not inconsistent with the needs of aviation that has been approved by the Secretary." *Id.* § 49104(a)(2)(A)(i)-(iv).

PRIVILEGED AND CONFIDENTIAL

183.   Interpreted according to their ordinary meaning, subparagraphs (iii) and (iv) of this definition violate the non-delegation principle because they provide no intelligible principle by which MWAA can determine which activities are appropriate and which are not.   Accordingly, those two subparagraphs must either be ignored or construed to be restricted to activities that in some way directly serve the purposes identified in subparagraphs (i) or (ii).

184.   MWAA's operation of the Toll Road and its use of toll revenue to fund the Dulles Metrorail Project and the other activities and projects described above do not constitute an "airport purpose" within the proper meaning of the Airports Act, and those actions are therefore in violation of the Airports Act, construed to include meaningful, principled restrictions on MWAA's delegated authority.   Specifically, that activity is not an "aviation business or activity," because it is unrelated to aviation, and it does not directly serve such a business or activity.   Nor does the operation of the Toll Road—built, after all, to serve traffic *not* going to the airport— and MWAA's use of toll revenue to fund construction of the Dulles Metrorail Project— designed to serve a community of riders far broader than passengers just going to the airport—constitute an "activit[y] necessary or appropriate to serve passengers or cargo in air commerce."   Nor does it directly serve these objectives.

185.   Consequently, pursuant to the requirements of the Airports Act, as constitutionally construed, the Secretary should be ordered to direct that MWAA (a) withdraw from its agreements with VDOT to assume control of and operate the Toll Road and to construct the Metrorail Project, and (b) cease levying fees on Toll Road

PRIVILEGED AND CONFIDENTIAL

users to fund the Metrorail Project and any other projects and activities that are unrelated to genuine "airport purposes."   If MWAA does not do so within a reasonable time as determined by the Secretary, the Secretary should be ordered to retake possession of the property at issue.

186.   In addition, for this reason too, regardless whether MWAA is a valid Compact Clause entity, MWAA's prior and ongoing attempt to force Toll Road users to pay a disproportionate share of the Metrorail Project's cost through artificially inflated tolls is unlawful and must be set aside.

## Count Eight: Violation of MWAA's Lease
### MWAA's actions violate the terms of its lease.

187.   Plaintiffs hereby incorporate by reference all preceding paragraphs of the Complaint.

188.   The Airports Act requires the terms of MWAA's lease of the Metropolitan Washington Airports to include the terms of the Airports Act. 49 U.S.C. § 49104(a).

189.   MWAA's lease thus incorporates the requirements of the Airports Act that MWAA use leased property "only for airport purposes." *Id.* § 49104(a)(2)(A), (B).   As described above, these provisions of the Airports Act must be given a limiting construction to pass constitutional muster.   That limiting construction, in turn, must be applied to the terms of MWAA's lease.

190.   The real estate subject to the lease conveyed to MWAA includes land on which MWAA is spending its funds exacted from Toll Road users to maintain and repair rail cars that are not used and will not be used in the Dulles

**PRIVILEGED AND CONFIDENTIAL**

Transportation Corridor.  This use has no relation to legitimate "airport purposes," as discussed above.

191.   For example, MWAA is using Toll Road revenues to purchase rail cars that will be used on rail lines other than the Dulles Metrorail Project.  This activity has no relation to legitimate "airport purposes."

192.   MWAA's actions with respect to the Toll Road and the Dulles Metrorail Project violate MWAA's lease, because those actions are not valid "airport purposes" under the Airports Act.

193.   The Airports Act expressly empowers the courts of the United States "to compel [MWAA] and its officers and employee to comply with the terms of the lease."  *Id.* § 49104(c).

194.   Therefore, this Court should order MWAA to comply with the terms of its lease by ceasing to levy fees on Toll Road users to fund the Dulles Metrorail Project.

195.   The Court should also order the Secretary to take appropriate action with respect to MWAA's lease as required by the Airports Act.  *Id.* § 49104(a)(2)(C).

196.   In addition, for this reason too, regardless of whether MWAA is a valid Compact Clause entity, MWAA's attempt to force Toll Road users to pay a disproportionate share of the Metrorail Project's cost and the costs of other projects and activities unrelated to the Toll Road through artificially inflated tolls is unlawful and must be set aside.

PRIVILEGED AND CONFIDENTIAL

### Count Nine: Administrative Procedure Act
**MWAA's actions constitute unlawful agency action.**

197.   Plaintiffs hereby incorporate by reference all preceding paragraphs of the Complaint.

198.   MWAA is a public body authorized by Congress to exercise federal regulatory power. To that extent, MWAA's actions are reviewable under the standards of the Administrative Procedure Act.

199.   Under the Administrative Procedure Act, a court may set aside final agency action that is unlawful.  *See generally* 5 U.S.C. § 706(2)(A)-F) (setting forth grounds for finding agency action unlawful); *id.* § 704 (allowing judicial review of final agency action).

200.   MWAA is authorized by federal law to "operate, maintain, protect, promote, and develop the Metropolitan Washington Airports as a unit and as primary airports serving the Metropolitan Washington area." 49 U.S.C. § 49104(a)(1).

201.   Furthermore, MWAA is authorized to use the leased property interests "only for airport purposes." *Id.* § 49104(a)(2)(A)(iv), (B).

202.   By exacting money from Toll Road users to subsidize the Dulles Metrorail Project, MWAA undertook final agency action within the meaning of the Administrative Procedures Act.

203.   MWAA has also undertaken final agency actions with respect to the provision of maintenance and repair services for rail cars that are not used on the Dulles Metrorail Project, the purchase of rail cars that will not be used on the

**PRIVILEGED AND CONFIDENTIAL**

Dulles Metrorail Project, the establishment of a real estate management and marketing program, and the funding of improvements to State Route 606 in Loudoun County, all of which MWAA subsidizes with money exacted from Toll Road users.

204.    Those final agency actions by MWAA violated the Administrative Procedure Act because they were:

    a.   arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

    b.   contrary to constitutional right, power, privilege, or immunity;

    c.   in excess of statutory and/or constitutional jurisdiction, authority, or limitations, or short of statutory right; and

    d.   without observance of procedure required by law.

5 U.S.C. § 706(2)(A)-(D).

205.    Among other reasons, MWAA's levying fees on Toll Road users to fund the Metrorail Project and to fund other activities unrelated to the Toll Road (a) cannot constitute an action within any constitutionally acceptable construction of "airport purposes" as used in the Airports Act and in the terms of the Lease granted to MWAA by the Secretary; (b) violates the constitutional rights of Toll Road users; (c) as described above, is in excess of MWAA's constitutional and statutory authority if the Airports Act and the Lease are not given the limiting construction required by the Constitution; and (d) was undertaken without observance of procedure required by law.

**PRIVILEGED AND CONFIDENTIAL**

206.   Accordingly, MWAA's exaction of money from Toll Road users to subsidize the Dulles Metrorail Project and other activities that are unrelated to the Toll Road should therefore be held unlawful, set aside, and appropriate restitution made.

## Count Ten: Administrative Procedure Act
### The Secretary's actions constitute unlawful agency action.

207.   Plaintiffs hereby incorporate by reference all preceding paragraphs of the Complaint.

208.   The Secretary of Transportation is required by law to determine whether the real property subject to MWAA's lease is being used "only for airport purposes." 49 U.S.C. § 49104(a)(2)(B).

209.   Furthermore, if the Secretary determines that any of the leased property is used for other than airport purposes, the Secretary is required  to "direct that [MWAA] take appropriate measures to have that part of the property be used for airport purposes," and "retake possession of the property" if MWAA fails to have that part of the property be used for airport purposes within a reasonable period of time determined by the Secretary.  *Id.* § 49104(a)(2)(C).

210.   In October 2008, the Secretary of Transportation certified that MWAA's operation of the Toll Road and its use of toll revenue to fund construction of the Dulles Metrorail Project were valid "airport purposes" within the meaning of the MWAA lease.

211.   This action by the Secretary constituted final agency action within the meaning of the Administrative Procedure Act.

PRIVILEGED AND CONFIDENTIAL

212.   That final agency action by Secretary violated the Administrative Procedure Act because it was:

    a.   arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

    b.   contrary to constitutional right, power, privilege, or immunity;

    c.   in excess of statutory and/or constitutional jurisdiction, authority, or limitations, or short of statutory right; and

    d.   without observance of procedure required by law.

213.   Among other reasons, the Secretary's approval of MWAA's operation of the Toll Road and its use of toll revenue to fund construction of the Dulles Metrorail Project (a) unlawfully purports to approve activities not within any constitutionally acceptable construction of "airport purpose" as used in the Airports Act and in the terms of the Lease granted to MWAA by the Secretary; (b) violates the constitutional rights of Toll Road users; (c) as described above, unlawfully purports to approve activities which are in excess of MWAA's constitutional and statutory authority if the Airports Act and the Lease are not given the limiting construction required by the Constitution; and (d) was undertaken without observance of procedure required by law.

214.   The Secretary's action should therefore be held unlawful and set aside.

215.   Furthermore, in accordance with the Airports Act, the Secretary should be ordered to direct that MWAA cease levying fees on Toll Road users to fund the Dulles Metrorail Project.  If MWAA does not do so within a reasonable

PRIVILEGED AND CONFIDENTIAL

time as determined by the Secretary, the Secretary should be ordered to retake possession of the property at issue.

### Count Eleven: 42 U.S.C. § 1983
### MWAA's actions deprive plaintiffs of their federal rights under color of state law.

216. Plaintiffs hereby incorporate by reference all preceding paragraphs of the Complaint.

217. 42 U.S.C. § 1983 provides in relevant part that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]"

218. MWAA purports to exercise authority pursuant to an interstate compact approved by Congress.

219. The actions of a putative interstate compact entity—despite the fact that the compact is approved by Congress and its terms thereby become federal law— nonetheless constitute actions taken "under color of state law" for purposes of section 1983. *See Lake Country Estates v. Tahoe Regional Planning Agency*, 440 U.S. 391, 399-400 (1979) (holding that actions by compact entity formed by California and Nevada were "under color of state law" for purposes of section 1983).

**PRIVILEGED AND CONFIDENTIAL**

220.   Indeed, relying on *Lake Country Estates,* MWAA itself has claimed in the Supreme Court that it is "empowered by and function[s] pursuant to state law." Brief for the Petitioners, 1991 WL 521281, *19, *CAAN* (filed March 1, 1991).

221.   MWAA therefore exercises authority "under color of state law" for purposes of section 1983.

222.   For the reasons set forth in some or all of Counts 1 through 10, MWAA's actions exacting money from Toll Road users to subsidize the Dulles Metrorail Project and other activities unrelated to the use of the Toll Road deprive the Plaintiffs of their rights, privileges, and immunities secured by the Constitution and laws.

223.   MWAA is therefore liable to the Plaintiffs for redress under applicable law.

## PRAYER FOR RELIEF

Plaintiffs, individually and on behalf of all others similarly situated, request the Court to enter judgment against defendants as follows:

A.   an order certifying an appropriate Class and/or Subclasses, designating Plaintiffs as Class Representatives, and designating their counsel of record as Class Counsel;

B.   an order declaring that MWAA's exaction and retention of money from plaintiffs to fund the Metrorail Project and other activities unrelated to the Toll Road are illegal and unconstitutional;

PRIVILEGED AND CONFIDENTIAL

C.      an order declaring that the Secretary's certification of the Metrorail Project as a valid "airport purpose" under the Airports Act and MWAA lease is unlawful under the Administrative Procedure Act;

D.      an order setting aside the Secretary's certification of the Metrorail Project as a valid "airport purpose" under the Airports Act and MWAA lease;

E.      an order enjoining the Secretary to direct that MWAA may no longer validly exact funds from the plaintiffs to fund the Metrorail Project and other activities unrelated to the Toll Road under the Airports Act and MWAA's lease;

F.      an order enjoining MWAA from continuing to exact funds from plaintiffs to subsidize the Silver Line Project and other activities unrelated to the use of the Toll Road;

G.      a declaration that MWAA is financially responsible for notifying all Class members that they have been the subject of an unconstitutional, illegal, and/or unauthorized exaction and other activities unrelated to the Toll Road;

H.      a declaration that MWAA must disgorge, for the benefit of Plaintiffs and Class members, all of the money that has been illegally exacted and retained in the form of Toll Road fees;

I.      an order requiring restitution of the amount of money Plaintiffs and Class members have been unlawfully required to subsidize the Silver Line Project and other activities unrelated to the use of the Toll Road;

J.      an award of attorneys' fees and costs, as allowed by law;

PRIVILEGED AND CONFIDENTIAL

K. an award of pre-judgment and post-judgment interest, as provided by law;

L. leave to amend this Complaint to conform to the evidence produced at trial;

M. such other relief as may be appropriate under the circumstances.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs, individually and on behalf of the Class, demand a trial by jury of any and all issues in this action so triable by right.

Respectfully submitted,

<table>
<tr>
<td>

_/s/ Robert J. Cynkar_<br>
ROBERT J. CYNKAR (D.C. Bar No. 957845)<br>
rcynkar@mck-lawyers.com<br>
PATRICK M. MCSWEENEY (*Pro hac vice* motion pending)<br>
patrick@mck-lawyers.com<br>
CHRISTOPHER I. KACHOUROFF (*Pro hac vice* motion pending)<br>
MCSWEENEY, CYNKAR & KACHOUROFF. PLLC<br>
13649 Office Place, Suite 101<br>
Woodbridge, VA 22192<br>
(703) 621-3300

</td>
<td>

_/s/ S. Kyle Duncan_<br>
S. KYLE DUNCAN (D.C. Bar No. 1010452)<br>
KDuncan@Schaerr-Duncan.com<br>
GENE C. SCHAERR (D.C. Bar No. 416638)<br>
GSchaerr@Schaerr-Duncan.com<br>
SCHAERR|DUNCAN LLP<br>
1717 K Street NW, Suite 900<br>
Washington, DC 20006<br>
(202) 714-9492

</td>
</tr>
</table>

*Counsel for Plaintiffs*